# In the United States Court of Federal Claims

No. 19-728T
(Filed: July 26, 2021)

* * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| GSS HOLDINGS (LIBERTY) INC., | Tax refund suit; I.RC. § 707(b)(1); I.R.C. § 165; Related party transaction; Substance over form; Step transaction doctrine; *Danielson* rule. |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

* * * * * * * * * * * * * * * * * * * *

*Brian W. Kittle*, New York, NY, with whom was *James B. Kelly*, for plaintiff.

*Dara B. Oliphant*, Trial Attorney, United States Department of Justice, Tax Division, Washington, DC, with whom were *David A. Hubbert*, Acting Assistant Attorney General, *David I. Pincus*, Section Chief, *G. Robson Stewart*, Assistant Chief, *Joseph A. Sergi*, Senior Litigation Counsel, *Patrick Phippen*, Trial Attorney, and *Jeremy A. Rill*, Trial Attorney, for defendant.

## OPINION

BRUGGINK, *Judge.*

    This tax refund action, brought by GSS Holdings ("GSS"), is a petition for allowance of a claimed loss deduction arising under 26 U.S.C. § 165.[1] At issue is a deduction claimed in the tax year ended December 31, 2011, and carried back to the tax year ended December 31, 2009. Plaintiff contends that the disallowance by the Internal Revenue Service ("IRS") was

---

[1] All subsequent references to the United States Code and sections within the code are to Title 26 and the Internal Revenue Code of 1986 as amended ("the Code") unless otherwise noted.

inappropriate. The case is before us on cross motions for summary judgment. Oral argument was held on July 14, 2021.

The IRS invoked the step transaction doctrine to characterize the events that resulted in the claimed deduction as a single sale transaction. The result is that the loss was treated as a single event—loss on sale of business assets. Because the transaction was with a related party, § 707(b)(1) applied and the IRS disallowed a deduction. If the loss, as plaintiff asserts, is not characterized as part of the sale of business assets, it would be allowed and be deductible under § 165(a) as an ordinary loss. We disagree with plaintiff and agree with the government that the loss stems from the sale of a capital asset. Thus, as further explained below, we deny plaintiff's motion for summary judgment and grant defendant's.

## BACKGROUND[2]

Liberty Street Funding LLC ("Liberty") is a commercial paper conduit[3] and wholly owned subsidiary of GSS.[4] For tax purposes Liberty Street is a flow through partnership, in which GSS is a partner. In 2011, Liberty filed an IRS 1065 Partnership Tax Return that included the sale of financial assets on IRS Form 4797, reflecting a loss of $22,549,612. That loss stemmed from a payment made to the Bank of Nova Scotia ("BNS") out of a Liberty-held account in conjunction with a sale of a package of assets to BNS by Liberty, discussed in further detail below. BNS was also the parent

---

[2] The facts are drawn from the attachments to the parties' briefs and are not materially disputed.

[3] As explained in his deposition by Mr. Peter Gartland, Director of Global Securitization at BNS, a commercial paper conduit is a financial vehicle that makes investments funded by the issuance of short-term notes (commercial paper). It reinvests the proceeds in longer term investments. The conduit profits off the spread, or the rate of return on its investments that are in excess of the interest rate paid on the commercial paper that it issues.

[4] As explained by plaintiff, GSS is the legal owner of Liberty Street. GSS's equity is "nominal," totaling only $25,000; so it requires additional financial support to operate. The "legal shareholder does not have any decision-making ability, nor is it required to absorb any expected losses or receive any expected residual returns." Pl.'s Ex. 1 at 2-3. As discussed in the depositions, Bank of Nova Scotia, as administrator, controls the operations of Liberty Street.

of GSS's 1065 Liberty Street Tax Partner, Scotiabank (Ireland) Limited ("Scotiabank").  The IRS disallowed a deduction for the loss on the transaction as a sale to a related party.  GSS asserts that the loss was an ordinary business loss deductible under I.R.C. §165 and that the related entity rule should not apply.

The relevant transactions occurred on December 29 and 30, 2011. The first was the exercise by Liberty of a Liquidity Asset Purchase Agreement[5] ("LAPA") which required BNS to purchase distressed financial assets (in this instance known as "Aaardvark")[6] from Liberty at a preset ("par") value equal to Liberty's basis in the assets.[7]  In conjunction with the sale of these assets to BNS, Liberty was also required, under the terms of a separately executed First Loss Note, further explained below, to transfer $24,000,000 to BNS.  Liberty simultaneously received approximately $1.45 million in insurance proceeds from this event.  The $24,000,000 cash transfer

---

[5] As discussed by Mr. Gartland in his deposition, to mitigate or hedge against liquidity risk inherent in the business model, commercial paper conduits create Liquidity Asset Purchase Agreements ("LAPAs") for every package of longer-term investments the conduit purchases. The LAPA ensures liquidity by giving the conduit the ability to put the investment package to a counterparty at a preset price, regardless of the investments market value. For this protection Liberty pays a liquidity fee to the counterparty.  Plaintiff represents that Liberty has created a LAPA for every investment it has entered since inception in 1997.  Plaintiff also notes that BNS was the counterparty to over 95% of Liberty's LAPAs.  As mentioned, BNS was also the administrator of Liberty.

[6] Mr. Gartland further explained that these assets were an investment known as "Aaardvark IV." Aaardvark IV was an Oppenheimer Funds special purpose investment vehicle referred to as a "warehouse facility." The fund held mortgage-backed securities and other financial assets.  Like all investments Liberty enters, it set up a corresponding LAPA agreement, which was renewed annually.

[7] For example, if Liberty purchased an investment for $100, and subsequently the market value of the investment declined to $80, the LAPA allowed Liberty to force the counterparty to pay a preset ("par") value for the investment. If Bank X had agreed to be the counterparty to the LAPA, and the preset price was $100, Bank X would be required to pay $100 to Liberty for the investment assets.  This essentially shifts the risk of investment decline to the counterparty.

3

netted with the $1.45 million insurance proceeds result in the disputed $22,549,612 loss.

The $24,000,000 payment was from a Liberty bank account called the First Loss Note Reserve Account. As explained in several depositions cited by plaintiff, the funds in this account were loaned to Liberty and held for the benefit of, and to be paid to, the first party to suffer a loss upon a LAPA agreement being invoked. The creditor on the Note at the time of the transactions at issue was BNS subsidiary Scotiabank. As creditor on the note, Scotiabank was also Liberty's partner for federal tax purposes.

As of December 29, 2011, Scotiabank had just become the creditor one day prior to the LAPA transaction. It acquired the First Loss Note from an independent third-party entity, Reconnaissance Investors, LLC.[8] We accept plaintiff's assertion that the reason for Scotiabank's acquisition of the Note was to internalize the high interest expense[9] and because the original purpose of the note no longer existed under new accounting standards.[10]

As a result of Scotiabank acquiring the First Loss Note, the Liberty-Reconnaissance tax partnership was terminated on December 29. Liberty therefore filed a second 2011 short year tax return with its new tax partner, Scotiabank, for the final 3 days in 2011. It is on this second, short-year tax return that the disputed transaction was reported.

Plaintiff refers to several depositions to provide background on the First Loss Note and explain its purposes and the changes resulting from evolving regulatory and accounting requirements. The explanations are not materially challenged by defendant, and we accept them at face value.

---

[8] Reconnaissance Investors, LLC was replaced on April 30, 2008, by an affiliate Reconnaissance Investors IV, LLC (together with Reconnaissance Investors, LLC, collectively "Reconnaissance").

[9] The rate of interest on the note ranged from 16% to 32% per annum as noted in the Note Purchase agreement and Amendment.

[10] BNS adopted the International Financial Reporting Standards ("IFRS") in 2011. Plaintiff refers to depositions and internal memos indicating that, under IFRS, the bank was required to consolidate Liberty onto its balance sheet.

BNS was also the administrator of Liberty, and in that role managed the conduit as well as absorbed most of the benefit and risk of the operation. Pursuant to Canadian banking regulations, Liberty was consolidated on the BNS balance sheet until 2007.[11] In 2007, the Canadian Office of the Supervisor of Financial Institutions adopted the Basel II bank regulations.[12] As a result, BNS sought to get Liberty off its balance sheet.[13] The First loss note was the tool that shifted Liberty's credit risk away from BNS and allowed BNS to deconsolidate from Liberty.[14]

---

[11] As detailed in a February 2007 Memo by Scotia Capital, until 2007, BNS was the primary beneficiary of Liberty's operations and reported Liberty's activities on its consolidated balance sheet. Internal memos provided by plaintiff indicate that, on April 30, 2007, the issuance of the First Loss Note to a third-party shifted enough of the risks and benefits associated with Liberty away from BNS so that BNS no longer had to consolidate Liberty onto its financial statements.

[12] Basel II was a set of international banking regulations that changed capital requirements for banks as a consequence of the expansion of the Basel I international banking accords. The Basel Committee on Banking and Supervision issued the expanded proposed requirements in 2004, and they were adopted by Canada, taking effect in 2007.

[13] Plaintiff cites several depositions detailing the impact of the new regulations on the banking business. The Basel II regulations increased minimum capital requirements and required banks to incorporate the credit risks of bank held assets in computation of regulatory capital ratios. By deconsolidating Liberty from the balance sheet, BNS could avoid the adverse effects the conduit would have on BNS capital allocation under the new regulations.

[14] Plaintiff cites the terms of the agreement, as well as several depositions, to detail the function of the First Loss Note Agreement. Under the Agreement, Reconnaissance loaned money to Liberty to be used to compensate Liberty's LAPA counterparties if a Liberty investment was put to the counterpart at a loss (market value being below the par value). Essentially, Reconnaissance became the party to suffer the first loss if a Liberty investment package declined in value and the LAPA was exercised. Reconnaissance deposited a total of $40 million into the First Loss Note account between 2007 and 2008. It was paid interest on that amount as compensation for the risk it took.

In 2011, however, BNS adopted the International Financial Reporting Standards. This accounting change required BNS once again to reconsolidate Liberty onto its balance sheet, irrespective of the First Loss Note held by Reconnaissance. Having been forced to reconsolidate, the need to shift credit risk to a third party was no longer applicable. At this point, in late 2011, BNS subsidiary Scotiabank began the process of acquiring the note from Reconnaissance, which, according to plaintiff, it could do by contractual right. Scotiabank acquired the note December 29. One day later, Liberty exercised the LAPA on the Aaardvark IV investment, and because there was a substantial loss, triggered the transfer of the balance in the First Loss Note Account to BNS.

Liberty recorded this December 30 purchase of Aaardvark IV by BNS on its tax returns on an IRS Form 4797 for tax year 2011. Liberty listed the basis of the Aaardvark Investment at $244,648,409, which included the par value of the assets as well as the $24,000,000 in funds from the First Loss Note Account transferred to BNS. Liberty reported a sales price of $222,098,797 which included $220,648,409 (the par value of Aaardvark) and $1,450,388 in insurance. Liberty netted these sums together on the Form 4797, resulting in a claimed net loss of $22,549,612, which was allocated to flow through to GSS. Pl. Ex. 45, at 982-984 (IRS Form 886-A Explanation of Items).

In June 2013, GSS filed an IRS Form 1120X Amended U.S. Corporation Income Tax Return for the 2009 Tax Year to carryback the loss associated with the 2011 Liberty transaction.[15] On the Form 1120X, GSS characterized the transaction differently than Liberty had. GSS claimed an ordinary and necessary loss deductible under I.R.C. §165 for the transfer of $24,000,000, minus the insurance proceeds, from the First Loss Note Account, presenting this transfer separately from the sale of investments on Form 4797. Characterized this way—not as a loss on the sale of an asset— the § 707(b)(1) prohibition of deducting loses on the sale or exchange of property with a related party would not apply.

GSS thus claims that the Liberty partnership tax return was incorrect in consolidating the $24,000,000 transfer payment into the sale of a capital asset on Form 4797. GSS's 1120X nets the payment of the $24,000,000[16]

---

[15] The parties make no mention of GSS's original Form 1120 or what changes initiated the amended return, but it makes no difference to the present dispute.

[16] BNS included the $24 million as ordinary income on its own tax return.

6

from the First Loss Note with the offsetting $1.45 million insurance payment, resulting in a claimed $22.5 million ordinary loss deductible under I.R.C. § 165. GSS's position is consistent with the tax treatment of similar transactions prior to Scotiabank becoming the tax partner in Liberty.[17]

In December of 2014, the IRS issued a Form 5701 Notice of Proposed Adjustment to GSS with respect to the 2011 tax year, disallowing the claimed First Loss Note payment deduction. GSS disagreed and submitted a Protest to the IRS Office of Appeals in January 2015. On June 23, 2017, the IRS Appeals Team Manager issued a Notice of Disallowance to GSS with respect to the claimed $22,549,612 loss. GSS disagrees with that disallowance and the present suit resulted.

GSS filed its complaint here on May 16, 2019. After collecting documents related to the events in question and taking depositions of several people involved in the transactions, GSS asks the court to find that the step transaction doctrine was inappropriately applied here to collapse the disputed events into a single sales transaction and, instead, that the events should be viewed separately so that the First Loss Note transfer is viewed in isolation as a deductible ordinary §165 loss. Defendant filed a cross motion for summary judgment, asking the court to endorse the IRS position that the LAPA sale and corresponding First Loss Note are in substance one transaction correctly reported by Liberty on its Form 4797 and further that plaintiff should be precluded from altering the form in which the partnership originally chose to report the transaction on its tax return. The issues have been fully briefed. The parties agree as to the material facts and, as explained below, any disagreements are not material to the legal conclusions.

## DISCUSSION

We have jurisdiction over a challenge to tax alleged to have been erroneously assessed or collected pursuant to 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422. The central question in this case is what

---

[17] In March of 2008, while Reconnaissance was the creditor on the First Loss Note, Liberty executed a LAPA with BNS, which was later triggered, prompting BNS to buy a Liberty investment package at a par value significantly above the then current market value. Because BNS had to write down the investment, $16 million was paid out of the First Loss Note account to BNS. Liberty wrote this payment off as an ordinary loss in 2008, and it went unchallenged as such by the IRS.

7

the relation of the $24 million First Loss Note payment was to the sale of Aaardvark IV. If the payment was part of the capital sale, in essence an offset to the price paid by BNS, then §707 disallows the loss because it was part of a related party transaction. If the payment is an ordinary business loss, it is irrelevant that the parties are related, and the loss is an allowable deduction under §165.

Defendant makes two arguments as to why the payment should have a capital character. The first is that the First Loss Note payment is inextricably linked to the LAPA sale of Aaardvark IV, and, as such, these two events must be viewed collectively, with the result that the payment is collapsed into a capital sale under the step transaction doctrine. The government's second argument is that Liberty originally reported the payment netted together with the LAPA Aaardvark sale, (thus giving it capital character), and as such the *Danielson* rule precludes the taxpayer from later recharacterizing the transactions.[18]

Plaintiff's position is that it is improper to artificially consolidate the two events because, at the time of the creation of the LAPA, the parties could not have intended that the transaction would occur for the simple reason that the First Loss Note Agreement was not yet in place. Plaintiff also argues that the *Danielson* Rule is inapplicable here because it only applies to bind parties to reflect the same characterization for tax purposes as the parties agreed upon in the associated contractual obligations. The characterization on the partnership tax return is thus irrelevant, per GSS.

I.  The *Danielson* Rule

We begin with the latter argument, that the *Danielson* rule binds GSS to the tax characterization originally reported by Liberty. Because Liberty initially reported the transaction on IRS Form 4797 and netted the results of the LAPA sale with the payment from the First Loss Note, defendant argues that Liberty is precluded from changing that characterization. We disagree.

The *Danielson* rule binds a taxpayer to the original form chosen for a transaction if the taxpayer later tries to recharacterize part of that transaction for tax purposes. *See Comm'r v. Danielson*, 378 F.2d 771 (3d Cir. 1967). In *Danielson*, the taxpayer was not permitted to recharacterize the allocation of

---

[18] *See Comm'r v. Danielson*, 378 F.2d 771 (3d Cir. 1967) (*en banc*), *aff'd by* 694 F.3d 96 (Fed. Cir. 2012) (Rule binds taxpayer to the characterization of a transaction originally chosen by the taxpayer).

8

consideration in a contract from payment for items that resulted in ordinary income tax to items that would result in capital gains tax, even when the original contractual allocation was likely incorrect. *Id*. at 777-78. The taxpayer is forced to live with the tax consequences of its initial contractual allocation. *Id*. at 778.

Plaintiff argues that *Danielson* is inapplicable to its case because Liberty never explicitly contracted or agreed to any allocation or characterization of the First Loss Note payment in the disputed transactions. Rather, Liberty, according to plaintiff, merely incorrectly netted the two separate events on Form 4797 as a single sale of business assets. Plaintiff argues that it would be an impermissible extension of the rule to bind a taxpayer to an allegedly erroneous characterization reported on a tax form. As plaintiff correctly points out, Form 4797 is not an agreement to characterize a transaction in a particular way. Plaintiff claims that the original reporting on the Form 4797 was filed in error, and that error was the result of the complicated circumstances surrounding the transactions.[19]

The *Danielson* rule has only been used to bind taxpayers to certain characterizations agreed upon by contract. Those contractual allocations bind taxpayers to report transactions consistent with their business arrangements. *See Hartman v Untied States*, 99 Fed. Cl 168, 180 (2011). "[T]he Federal Circuit has only applied the rule when a taxpayer challenges 'express allocations of monetary consideration . . . .'" *Id*. at 181 (quoting *Lane Bryant v. United States*, 35 F.3d 1570, 1575 (Fed. Cir. 1994)). We decline to expand its reach. We are confronted with a characterization on a tax return by the pass-through partnership that the government now seeks to deem irrevocable. Liberty's tax return (a partnership return) was only informational, not an allocation of consideration in a contractual agreement. It is therefore not binding as an allocation for tax purposes.

---

[19] Plaintiff notes that the confusion created by the termination of the Liberty-Reconnaissance partnership and the creation of the Liberty-Scotiabank partnership at the assignment of the First Loss Note from Reconnaissance to Scotiabank on December 29, 2011, required Liberty to file two 2011 tax returns, one for each partnership. Plaintiff argues this event and the complicated transactions involved in the triggering of the LAPA on December 30 led to confusion and error on part of Liberty's 2011 tax return.

II. Substance over form

We thus turn to defendant's second argument, which is that the sale and First Loss Note payment were, in substance, a single transaction. Defendant terms this an application of the "step transaction doctrine." We think it more useful to view the question under the larger tax law concept of "substance over form." *Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005). "Interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Id*. (quoting *Comm'r v. Clark*, 489 U.S. 726, 738 (1989)). The purpose of the doctrine is to "give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance." *Id*. (quoting *Dietzsch v. United States*, 498 F.2d 1344, 1346 (Ct. Cl. 1974)). "[I]t is the taxpayer who bears the burden of proving that the transaction has economic substance. *Coltec Indus. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006). The measure of economic substance is objective, not subjective. *Id.* at 1356. ("[A]ll courts have looked to the objective reality of the transaction in assessing its economic substance."). *See also Black & Decker Corp. v. United States*, 436 F.3d 431, 441-42 (4th Cir. 2006).

We note that, rather than extracting unnecessary or fictious transactions, as is often contemplated in applying a step transaction analysis, the government takes no issue with either of the transactional steps here. Instead, defendant argues that the linked character of the two transactions becomes clear when the effect, or intent of of the First Loss Note is considered. First Loss Note payments were made in only tandem with a LAPA sale. The two are inextricably linked.

In the larger family of substance over form cases, courts consider several factors. The transaction that is to be analyzed is "the one that gave rise to the alleged tax benefit." *Coltec Indus.*, 454 F.3d at 1356. The focus of analysis thus needs to be on the sale in question, not the underlying business purposes that created the framework that enabled the transaction. *See Id*. at 1358 ("[Plaintiff's] asserted business purpose focuses on the wrong transaction . . ."). In *Coltec*, the plaintiff company created a subsidiary, then issued a note payable to the subsidiary while also transferring the parent company's contingent liabilities to the subsidiary. The plaintiff's company subsequently sold a stake in the subsidiary for a significant loss to generate tax savings. *Id*. As the *Coltec* court noted, the creation of the subsidiary may have had a legitimate business purpose, but that the "substance over form" analysis must focus only on the sale in the subsidiary that created the loss. *Id.* While the creation of the subsidiary was legitimate, the loss creating sale

10

of the subsidiary had no economic substance. *Id.* As the court further put it, "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." *Id*. at 1357. *Cf. Jade Trading, LLC v United States*, 80 Fed. Cl. 11, 52 (2007) (transactions in dispute were not "genuine multiparty transactions" instead they were part of a "preordained plan."). As the *Coltec* court also elaborated, "our predecessor court in *Basic Inc.* disregarded an inter-company transfer of stock whereby a subsidiary, 'through its controlling parent, was caused to transfer the property whose sale the parent had decided upon for its own separate purposes.'" 454 F.3d at 1358 (quoting *Basic Inc. v. United States*, 549 F.2d 740, 746 (Ct. Cl. 1977). Although not between a parent and subsidiary, save for BNS's ownership of Scotiabank, we find the *Coltec* analysis particularly apposite here due to the tight web of contractual and legal relationships between the parties to the sale.

For the step transaction doctrine specifically, there are no universal tests, but there are three typical methods of inquiry to determine the interrelatedness of separate steps. *Falconwood*, 422 F.3d at 1349. These methods include the "interdependence test," the "binding commitment test," and the "end result test." *Id*. The disputed events need only satisfy one of the tests to apply the step transaction doctrine. *True v. United States*, 190 F.3d 1165, 1175 (10th Cir. 1999). Defendant urges that the "end result test" is applicable here.[20] The end result test is used to determine if a series of transactions are independent, or if they are actually components of a single transaction that was intended from the outset with the purpose of reaching an ultimate result. *Falconwood*, 422 F.3d at 1349.

Intent of the taxpayer is especially relevant for an end results analysis. *True*, 190 F.3d at 1175. The intent question is "not whether the taxpayer

---

[20] The interdependence test is an inquiry "into whether the individual transactions in the series would be 'fruitless' without completion of the series." *Stobie Creek Invs. v. United States*, 82 Fed. Cl. 636, 699 (2008). The binding commitment test is infrequently applied and analyzes whether the taxpayer, when entering the first transaction, is obligated to pursue successive steps in a series of later transactions. *True*, 190 F.3d at1175 n.8. The Federal Circuit has not endorsed the binding commitment test and noted "the binding commitment test was squarely rejected by our predecessor court in *King*." *Falconwood*, 422 F.3d at 1349 n.5 (citing *King Enters., Inc. v. United States*, 418 F.2d 511, 518 (Ct. Cl. 1969)).

intended to avoid taxes."[21] *Id.* The inquiry is whether the taxpayer intended to reach a particular result through a series of transactions. *Id.* "[I]f a taxpayer engages in a series of steps that achieve a particular result, he cannot request independent tax recognition of the individual steps unless he shows that at the time he engaged in the individual step, its result was the intended end result in and of itself." *Id.* at 1175 n.9.

Here, there is no disagreement that, on December 30, 2011, BNS and Liberty were related parties for tax purposes because of the investment by Scotiabank, BNS's subsidiary, in the First Loss Note. The fact that the LAPA was executed and resulted in the sale of Aaardvark IV to BNS is also not disputed, nor is the characterization of this event as a sale of capital assets on IRS Form 4797. Finally, it is undisputed that the function of the First Loss Note was to compensate the first party to experience losses as a result of a Liberty LAPA call. A payment from the First Loss Note account was always anticipated to be at least a partial offset of losses resulting from the sale of a distressed asset.[22]

Plaintiff relies on *Falconwood*, arguing that independent business purposes preclude applying the step transaction doctrine. It focuses on the creation of the First Loss Note. GSS asserts that regulatory and accounting changes drove the creation of the First Loss Note and its later acquisition by Scotiabank, not tax avoidance.[23] Plaintiff insists that the step-transaction

---

[21] Tax avoidance is a legitimate motive when structuring business deals, but where parties are interrelated, the court may exercise "a heighted level of skepticism and scrutiny in th[e] matter." *True*, 190 F.3d at1173 n.6.

[22] Defendant cautions that summary judgment for plaintiff may not be appropriate, asserting that issues of fact exist regarding the business purpose and intent that drove the creation of the LAPA agreement in 2006 and the First Loss Note in 2007. Plaintiff cites testimony from witnesses whose employment began after 2006 and 2007, at a time when they cannot have known what Liberty's intent was in previously creating those agreements. We disagree, however, that this raises an issue of material fact, and defendant conceded as much during oral argument. Defendants quibble was with the irrelevant question of why the First Loss Note was created, when the proper question is how the First Loss Note was intended to function. Here there is no material dispute. The First Loss Note was always intended to absorb the first loss stemming out of a decline in Liberty's investments.

[23] Further, plaintiff's argument misconstrues and expands the application of *Falconwood* beyond its facts. In that case, the independent purpose of the

doctrine cannot be applied because there were legitimate business reasons to create the First Loss Note and that, under the "end results" test, it could never have intended to make the First Loss Note payment because Liberty never intended to invest in declining assets. While we have no reason to question plaintiff's assertions about Liberty's First Loss Note intentions, plaintiff focuses on the wrong transaction.

The relevant event is not the creation of the First Loss Note Account. It is the payment out of it to BNS at the end of 2011. That payment had no purpose other than to offset, or as defendant put it, rebate, some of the loss built into the Aaardvark purchase price. When that narrower focus is applied, the answer becomes clear. The $24 million payment was part of the Aardvark transaction. There is no question that the "taxpayer intended to reach a particular result" here, *True*, 190 F.3d at 1175, namely, to use the First Loss Note payment to offset some of the LAPA counterparty's losses. Plaintiff admits as much in its brief: "[The First Loss Note agreements] ensured that Reconnaissance—and any subsequent investor in the First Loss Note—would have first exposure to losses on Liberty Street's assets." Pl.'s Mot. for Summ. J. 13. The First Loss Note, also referred to as the "expected loss note," required the extension of funds when "an instrument invested in by Liberty should experience a 'loss.'" *Id.* at 11, 13. The First Loss Note payment was intended to be made *in conjunction* with a capital sale. A LAPA sale was a condition precedent to a First Loss Note payment. Although Liberty could have entered a LAPA with BNS without a corresponding First Loss Note, we cannot ignore the fact that, at the time the First Loss Note came into existence, the Aaardvark LAPA was already in place. Thus the two are inextricably linked. The payment from Liberty's expected loss account to BNS was unquestionably part of the LAPA sale. The former was triggered by the latter.

## CONCLUSION

Whether we consider the two transactions "stepped together" or if we analyze the substance (purpose) of the transactions as a unified whole, the result is the same. The First Loss Note payment was part of a capital sale. It

---

questioned transactions was compliance with regulatory requirements that mandated the steps taken by the plaintiff there. 422 F.3d 1352. The *Falconwood* court itself noted that "courts have rejected the notion that a valid business purpose necessarily bars application of the step transaction doctrine." *Id.* at 1350. We find no application of the principle in *Falconwood* to the facts at bar that would save plaintiff's loss deduction.

13

is plaintiff's misfortune that, at the time the particular sale was initiated, Scotiabank had become a partner in Liberty.  Because the First Loss Note payment is properly classed as part of the LAPA investment sale, §707(b)(1) disallows deducting losses on the sale of assets to a related party, and the First Loss Note payment was thus properly disallowed.  Accordingly, the following is ordered:

1. Plaintiff's motion for summary judgment is denied.

2. Defendant's cross motion for summary judgment is granted.

3. The Clerk of Court is directed to enter judgment for defendant.  No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge